IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

```
CARL HART,                        )
                                  )
     Plaintiff,                   )
                                  )
vs.                               )    CAUSE NO. 2:09-CV-065
                                  )
ARCELORMITTAL STEEL,[1]           )
                                  )
     Defendant.                   )
```

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgement, filed by the defendant, ArcelorMittal USA, Inc., on May 12, 2010 (DE #23). For the reasons set forth below, the Motion for Summary Judgment is **GRANTED**. Accordingly, the Clerk is **ORDERED** to enter judgment in favor of the defendant. The Clerk is **FURTHER ORDERED** to close this case.

BACKGROUND

Plaintiff, Carl Hart ("Hart"), filed his Complaint in the Lake Superior Court in Indiana on February 17, 2009. The case was removed to this Court on March 18, 2009, on the asserted basis of

---

[1] The defendant, ArcelorMittal USA, Inc. is improperly named in the Complaint as Arcelormittal Steel. For purposes of this Order, the defendant will be referred to as ArcelorMittal USA, Inc. or simply as Mittal.

1

both diversity and federal question jurisdiction. (DE #2, pp. 1-2.) In his Complaint, Hart alleges that as an employee of Defendant ArcelorMittal USA, Inc. ("Mittal"), he was afforded "rights and duties as delineated in his contract of employment" and that Mittal breached that "contract of employment" when it terminated him on or about July 8, 2008. (DE #1, Comp., ¶¶ 2, 3.) Specifically, Hart contends that Mittal violated its own Employee Assistance Program ("EAP") procedures culminating in Hart's discharge. (*Id*. at ¶ 6.)

Mittal filed the instant motion for summary judgment on May 12, 2010 (DE #23), arguing that summary judgment is appropriate because there are no genuine issues of material fact and judgment as a matter of law should be entered in Mittal's favor. Specifically, Mittal argues that Hart's claim is preempted by section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a) and thus should be dismissed. (DE #24, p. 1.) Mittal argues that Hart failed to meet the appropriate statute of limitations for section 301 claims and that, even if it would have been filed in a timely manner, Hart's claim fails because he cannot establish a violation of the agreement, a breach of the duty of fair representation by the union, or that he exhausted the proper grievance procedures. (*Id*.)

Hart filed a response on June 14, 2010, stating that there are material issues of fact which preclude summary judgment. (DE #27.)

Hart argues that his breach of contract claim is not preempted by federal law because the contract at issue is not the collective bargaining agreement ("CBA") but rather a last chance agreement ("LCA") from February of 2008. (DE #28, p. 5.) He asserts that, a LCA is a "separate and distinct agreement from the [CBA]," and that Indiana contract law should apply to this case. (*Id.* at 3, 5-6.)

Mittal filed a reply on July 1, 2010, arguing that the LCA is simply a supplement to the CBA, and, as such, must still be preempted by section 301 of the Labor-Management Relations Act. (DE #30, pp. 1, 3.)

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a

court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).

The burden is upon the movant to identify those portions of the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Stephens v.* Erickson, 569 F.3d 779, 786 (7th Cir. 2009); *Becker v. Tenenbaum-Hill Assocs. Inc.*, 914 F.2d 107, 110 (7th Cir. 1990). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (*citing Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original). *See also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993).

4

Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law.  *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002).  In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

Facts

Hart was an employee of Mittal, a steel company located in East Chicago, Indiana. (DE #24-1, Aff. of Tom Mueller, p. 1.)  He was hired in 1978 when Mittal was known as Inland Steel.  (DE #24-2, Hart Dep., p. 5.)  Hart's various jobs throughout his time at Mittal included lid man, line operator in 3 Cold Strip East, wrapper in 3 Cold Strip East, and slab checker at the 80-inch.  (*Id*. at 5-6.)  In August of 2007, Hart was a slab checker at the 80-inch.  (*Id*. at 6.)  As part of his duties as a slab checker, Hart was required to drive in a company vehicle between three different slab yards to check for and locate lost slabs.  (*Id*. at

7-8.)  Throughout his time at Mittal, Hart was a member of the United Steelworkers of America and Local Union No. 1010 (the "Union").  (*Id*. at 6-7.)  Mittal and the Union are parties to a CBA, which covers all represented employees.  (DE # 24-1, Aff. of Tom Mueller, pp. 1-2.)  The CBA includes a mandatory, binding grievance and arbitration procedure.  (*Id*. at 2; DE #24-1, CBA, pp. 3-11.)

On August 11, 2007, Hart reported for work shortly before his 4:00 a.m. to noon shift.  (DE #24-2, Hart Dep., p. 7.)  As Hart was about to exit a locker room, he was approached by a Plant Protection employee, Jeffrey Hynes, who smelled marijuana.  (DE #24-1, Aff. of Tom Mueller, p. 2; DE #24-2, Hart Dep., pp. 8-9, 14.)  Hart said that he had also smelled it after he exited his car and acknowledged that he was the only other person in that part of the plant.  (DE #24-2, Hart Dep., p. 9.)  Hynes asked Hart if he had smoked marijuana, and Hart responded that he was not smoking marijuana at the plant but that he had smoked marijuana, drank alcohol, and used cocaine earlier that night at a party which he had left about three hours prior to heading to work.  (*Id*. at 9-10.)

Hynes informed Hart that he had to go take a drug test because Hart was the only one in the vicinity of the marijuana smell.  (*Id*. at 11-12.)  Hart refused to go with Hynes and instead got in his car and drove away.  (*Id*. at 12.)  A fireman found Hart elsewhere on

6

the plant grounds, and Hart was subsequently taken in a security vehicle by Hynes to the plant clinic. (*Id*. at 13.) Hart submitted to a breathalyzer and urinalysis test at the clinic. (*Id*. at 14.) He tested negative for alcohol, but the urinalysis indicated that Hart had marijuana and cocaine in his system. (*Id*. at 14-15.)

Hart was suspended as a result of the positive drug test, and he subsequently filed a grievance on August 27, 2007. (*Id*. at 16.) Hart, with Union members present to represent him, attended a formal hearing on the grievance conducted by Mittal that same day. (*Id*. at 16-18.)

Hart was given a second and last chance at employment on February 29, 2008, when he, the Union, and Mittal convened and signed the LCA. (DE #24-2, Hart Dep., pp. 19-20; DE #24-2, LCA, pp. 31-32.) As part of the LCA, Hart was permitted to remain employed by Mittal under certain conditions, which included that:

> 4. [he] will not use or permit himself to be exposed to any mood altering substances (Alcohol, illicit drugs, or any drug not prescribed by a physician). The detection of the aforementioned substances, regardless of the amount, will be grounds for his immediate suspension preliminary to discharge;
>
> 6. [d]uring a five (5) year period following [his] return to work subsequent to his Last Chance Agreement, the Company may test him at any time for the presence of mood altering substances . . . . This random testing may be done utilizing any medically acceptable method including, breath, urine, drawn blood or hair analysis as determined by the Company; and
>
> 9. [he] will waive any right to the special

7

> Justice and Dignity Procedure outlined in the
> [CBA] in the event of any subsequent
> suspension-discharge action taken against him
> within a period of five (5) years from the
> date of [the LCA].

(DE #24-2, LCA, pp. 31-32.)

Once under the LCA, Hart submitted to a urine drug test on March 19, 2008, that was positive for cocaine. (DE #28-2, Lab Report, p. 1.) As a condition of the LCA, Hart met with and participated in activities prescribed by the Clinic Counselor. (DE #28-1, LCA, p. 1; DE #28-3, Mtg. Logs, pp. 1-5.) Hart's next drug screen was a urine test taken on May 22, 2008, and it was negative for all drugs. (DE # 28-4, Lab Report, p. 1.) As part of the conditions of the LCA, a hair follicle test was done on Hart's hair on June 23, 2008, as requested by Mittal. (DE #24-2, Hart Dep., p. 22; DE #28-5, Psychemedics Drug Test, p. 1.) The hair was taken from under Hart's arm and leg because he is bald. (DE #24-2, Hart Dep., p. 22; DE #28-6, Aff. of Hart, p. 1.) This test was positive for cocaine. (DE #24-2, Hart Dep., pp. 22; DE #28-5, Psychemedics Drug Test, p. 1.) The results indicated that Hart had used cocaine within a period approximately fifty-five (55) days prior to the test. (*Id*.) Hart's positive test for cocaine occurred one hundred sixteen days (116) after the LCA was signed. (*Id*.)

Mittal sent Hart a letter on July 2, 2008, informing him of his suspension pending discharge for violating the terms of the LCA. (DE #24-2, Letter, p. 33.) In the letter, Mittal advised

Hart that, pursuant to Article 5, Section I of the CBA, he was entitled to a hearing within five (5) days and could be represented by the Union at the hearing. (*Id*.) After receiving the letter, Hart contacted the Union to determine what the next step might be. (DE #24-2, Hart Dep., p. 24.) He was informed by the Union that he could get his own test results and submit them to the Union in order to challenge Mittal's discharge decision. (*Id*. at 24-25.) Hart went to his personal doctor, Dr. Chhabra, seeking his own hair follicle test. (*Id*.) Dr. Chhabra sent him to a laboratory for testing, but the laboratory told Hart he did not have enough hair to do the drug screening. (*Id*. at 25-26.) Hart did not go back to his doctor and did not obtain his own hair follicle test. (*Id*. at 26.) Instead, Hart proceeded to inform the Union that it would be hearing from his lawyer. (*Id*.) Mittal subsequently discharged Hart for violating the LCA in early July 2008. (DE #1, Comp., ¶ 3; DE #24-2, Hart Dep., p. 21.) At the time of his termination, Hart was within several months of receiving a pension for 30 years of service. (DE # 28-6, Aff. of Hart, p. 1.) Hart did not file another grievance after he was terminated in July of 2008; he did, however, institute an EEOC claim and subsequently received a right to sue letter dated November 18, 2008. (DE #24-2, Hart Dep., pp. 27-28; DE #28-9, EEOC Letter, p. 1.)

In his deposition taken on December 30, 2009, Hart stated the following when asked about the Union:

9

A: [T]hey violated the grievance of the contract.
Q: What do you mean?
A: Article III, Section G of the contract states that if you are - - if you're found dirty, alcohol or drug abuse, this is a medically treatable condition here and you are offered - - you are to be offered rehabilitation treatment - - to be sent to a facility for rehabilitation treatment. They never offered me treatment at all.
Q: You're saying "they." Who do you mean?
A: The company, nor the Union.
Q: Okay.
A: So they violated that agreement.
Q: The labor agreement?
A: Right.
Q: Now you're talking about the labor agreement between the company and the Union?
A: Yes.
Q: Okay. Well, did you ask them to file a grievance in July of 2008 after you were terminated?
A: No, because they poorly represented me and I felt like that they knew - - from dealing with all these other cases of drugs and alcohol, they should have presented that to me automatically because that's in the contract book. I shouldn't have to tell them their job. This is their job. They should know their job.
Q: Right. So your Complaint about the Union was that they didn't pursue the rehabilitation part of the labor agreement?
A: Correct.
Q: Okay. Bur is that the reason you didn't go ahead and file a grievance after you were terminated in July '08?
A: Yes.
Q: Because you didn't feel they had pursued that rehabilitation angle - -
A: Right.
Q: - - in the other grievance?
A: Correct.

. . . .

>   Q: This is a Complaint that was filed by your attorney in this case. I just want to have you look it over and see if you've seen that before.
>   A: Yes.
>   Q: Okay. On the first page, under breach of contract, in Paragraph 5, it says, 'there was an enforceable contract between plaintiff and defendant.' Is that the labor agreement that we talked about a few minutes ago between the company and the Union?
>   A: Yes.
>   Q: On the second page of the agreement, you say that the defendant failed to perform all the obligations and that - - in the second sentence, defendant violated its own EAP procedures culminating in the discharge of plaintiff. What were you referring to when you say, 'the defendant violated its own EAP procedures'?
>   A: Because the - - in the EAP procedures, which is John being the counselor, he told me to continue doing what I was doing as far as - - you know, in my rehabbing, the little bit that they had offered me. He told me to keep doing what I was doing, and I continuously - - to do what I was doing and they still terminated me.
>   Q: I see.

(DE #24-2, Hart Dep., pp. 60-62.)


Analysis

Hart now claims that the LCA, negotiated and signed by the Union and entered into between himself and Mittal, is a separate and distinct contract from the CBA that requires analysis under Indiana state contract law. Mittal replies that established law

holds that the LCA should be considered as a supplement to the CBA and, thus, treated as part of the CBA. Hart supplies no case law in support of his argument, and the Court finds that relevant case law is contrary to his position.

## The LCA is Treated as Part of the CBA

The applicable language of section 301(a) of the Labor-Management Relations Act reads: "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). The United States Supreme Court has held that the word "contract," as used in section 301(a), encompasses documents beyond just the CBA itself. *Retail Clerks Int'l Ass'n*, *Local Union Nos. 128 & 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 25-26 (1962) (finding a "strike settlement agreement" to be a "contract" for the purpose of section 301(a)). As a result, lower courts have consistently found conditional reinstatement agreements and LCAs to be "contracts" for section 301(a) purposes. For example, in *Cotter v. DaimlerChrysler Corp.*, 87 F.Supp.2d 746, 757 (E.D.Mich. 2000), the court found that a conditional reinstatement agreement "must be treated in the same manner as the collective bargaining agreement [for section 301(a) purposes] since it is a negotiated agreement that supplements [a]

12

CBA." *See also Tootsie Roll Indus., Inc. v. Local Union No. 1*, 832 F.2d 81, 84 (7th Cir. 1987); *Int'l Union of Operating Engineers Local 351 v. Cooper Natural Resources, Inc.*, 163 F.3d 916, 919 (5th Cir. 1999)(LCA "formed a binding contract pursuant to the CBA which was entitled to enforcement by the arbitrator. . . . The LCA must be thought of as a supplement to the CBA and is just as binding upon the arbitrator."); *Bakers Union Factory No. 326 v. ITT Continental Baking Co., Inc.*, 749 F.2d 350, 354 (6th Cir. 1984) (LCAs constitute formal contractual settlements of labor disputes and they should be construed as part of a CBA).

The fact that the LCA Hart entered into was a settlement of a previous grievance, was signed by a Union representative, and references the CBA in a provision requiring Hart to "waive any right to the special Justice and Dignity Procedure outlined in the Collective Bargaining Agreement . . . ," all lead to the conclusion that the LCA was a supplement to the CBA for section 301(a) purposes. The Complaint specifically refers to the breach of a "contract of employment" and states that Mittal "failed to perform all of obligations" under the contract and "violated its own EAP procedures." Furthermore, during his deposition, Hart reiterated that the issues in this lawsuit involve violations of the labor contract, Article III, Section G, violations of the grievance procedure, and violations of the EAP procedures. Taking all of these factors into consideration, it is clear that the LCA must be

viewed as a supplement to and a part of the CBA when analyzing and interpreting its provisions and the legal issues relevant to this case.

### Preemption by Section 301 of Labor-Management Relations Act

The principle rule of law governing questions involving interpretation of CBAs to resolve state law claims is that state law is pre-empted and federal labor-law principles must be employed to resolve the dispute. *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988). *See also, Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 23 (1983); *Smart v. Local 702 IBEW*, 562 F. 3d 798, 809-10 (7th Cir. 2009). In order to create uniformity throughout the nation and to avoid inconsistent results, section 301 of the Labor-Management Relations Act preempts state law in cases that necessitate the interpretation a CBA. *Lingle*, 486 U.S. at 405-06. Therefore, Hart's state law claim that Mittal breached the CBA and/or LCA is preempted by section 301 of the Labor-Management Relations Act and must be interpreted and decided under federal law.

### Exhaustion of Grievance Procedures for Section 301 Purposes

Generally, employees suing an employer or their representative union for breach of a labor agreement pursuant to section 301 must first exhaust grievance procedures under that labor agreement before seeking relief in the federal courts. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965); *see also Vail v. Raybestos*

*Products Co.*, 533 F. 3d 904, 908 (7th Cir. 2008); *Douglas v. American Information Technologies Corp.*, 877 F.2d 565, 573-74 (7th Cir. 1989). A very limited exception exists when the union has failed to fairly represent an employee; in such a case, the union has breached its duty of fair representation, and an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983). For a union to breach its duty of fair representation it must have acted in "a discriminatory, dishonest, arbitrary, or perfunctory fashion." *Id*.

Here, it is undisputed that Hart did not file another grievance, although he acknowledges that the Union informed him that it would represent him if he obtained his own hair follicle test. Hart may have had a difficulty in getting the test done, as the only lab he went to declined to perform the hair follicle test because his hair samples were inadequate, but instead of pursuing a test elsewhere, Hart chose to forgo the grievance process altogether and file a complaint instead. Additionally, Hart has not properly pled or supported any implied claim that the Union breached a duty of fair representation that was owed to him. In his deposition Hart did state that the Union represented him poorly, but this single assertion does not rise to the level necessary to support a breach of duty claim. Hart does not allege,

15

nor does the record show, any discriminatory, dishonest, arbitrary, or perfunctory actions by the Union.

As Hart did not exhaust the grievance remedies available under the CBA or provide any evidence to support a breach of duty of fair representation by the Union, summary judgment in favor of Mittal is appropriate.

<u>Statute of Limitations as Applied to "Hybrid" Claims</u>

In the alternative, Mittal argues that if Hart's Complaint is construed as a "hybrid" claim, it should be barred by the six (6) month statute of limitations applicable to hybrid section 301/fair representation claims.

In "hybrid" cases involving claims against both the employer for breach of contract and against the union for a breach of its duty of fair representation, the Supreme Court has held that federal law provides a six-month time limit in accordance with § 10(b) of the National Labor Relations Act. 29 U.S.C. § 160(b); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169-70 (1983). "Such 'hybrid' cases, which implicate federal labor law and important national policies, invoke the 'narrow exception' and are to be distinguished from 'straightforward' § 301 cases." *Jones v. General Elec. Co.*, 87 F. 3d 209, 212 (7th Cir. 1996). The time the statute begins to run on "hybrid" claims is when the union makes a final decision on the plaintiff's grievance or from the time the plaintiff discovers, or reasonably should have discovered,

16

that no further action would be taken on her grievance. *Chapple v. Nat. Starch & Chem. Co.*, 178 F.3d 501, 505 (7th Cir. 1999); *Johnson v. Graphic Comm. Int'l Union*, 930 F.2d 1178, 1183 (7th Cir. 1991).

In this case, the statute of limitations began to run when Hart discovered, or reasonably should have discovered, that no further action would be taken on his previous grievance or the subsequent decision to terminate him. Hart received a letter from Mittal on July 2, 2008, regarding his suspension pending final discharge. In that letter, Hart was advised that, per the terms of the CBA, he could request a hearing on the matter within five (5) days and that the Union would represent him at such hearing. However, Hart testified that, after receiving the letter and failing to obtain a drug test of his own, he "called the union and told the union that . . . they'll be hearing from me and my lawyer" and he confirmed that he did not ask the union to take any further action on his behalf. Therefore, by Hart's own admission and choice, he knew by at least July 10, 2008, the date of his final termination, that no further action would be taken on his previous grievance and/or termination. Hart did not file his claim until February 17, 2009, which is over six (6) months after the statute of limitations began to run. Thus, even if the Court were to construe Hart's claim as a "hybrid" section 301/fair representation claim, it is time barred.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (DE #23) is **GRANTED**.  Accordingly, the Clerk is **ORDERED** to enter judgment in favor of the defendant.  The Clerk is **FURTHER ORDERED** to close this case.


**DATED:  March 31, 2011**                         /s/RUDY LOZANO, Judge
                                                                          **United States District Court**

18